779 A.2d 1114 (2001)
Louis RICCI, Plaintiff-Appellant,
v.
CORPORATE EXPRESS OF THE EAST, INC., Defendant-Respondent.
Superior Court of New Jersey, Appellate Division.
Argued September 10, 2001.
Decided September 28, 2001.
*1115 Thomas J. Hagner, Cherry Hill, argued the cause for appellant (Kenney & Kearney, attorneys; Mr. Hagner, of counsel and on the brief).
Anthony J. Laura, Newark, argued the cause for respondent (Reed Smith attorneys; Mr. Laura and Greg A. Dadika, on the brief).
Before Judges HAVEY, COBURN and WEISSBARD.
The opinion of the court was delivered by COBURN, J.A.D.
Plaintiff Louis Ricci sold his business to defendant Corporate Express of the East, Inc. ("CEE"), became its employee, and was subsequently discharged. Three written contracts govern the transaction: a stock purchase agreement, a two-year employment agreement, and a non-competition agreement.
Plaintiff sued in the Chancery Division, seeking, in part, an injunction against CEE's enforcement of the restrictive covenants contained in the non-competition agreement. He also sought damages for breach of the other two agreements and later asserted a claim under the Law Against Discrimination, N.J.S.A. 10:5-1 to -41 (the LAD). CEE denied liability and asked for attorney's fees and costs. More than five months after CEE filed its answer, plaintiff moved unsuccessfully for transfer of the case to the Law Division. A year and a half later, CEE moved for summary judgment. Plaintiff responded, in part, by agreeing to voluntarily dismiss his LAD claim and his challenge to the validity of the non-competition agreement; however, he also moved for summary judgment on the contract claims relating to the sale of the business and his employment. The trial judge entered judgment for CEE. Within twenty days, CEE applied for attorney's fees and costs under fee-shifting provisions in two of the agreements and under the LAD. The trial judge entered an order granting CEE the entire amount requested, $103,332 in attorney's fees plus $9,442.67 in costs.
*1116 Plaintiff's appeal warrants a full discussion of three of his points: (1) that he, rather than CEE, was entitled to summary judgment on his claim alleging breach of the employment agreement; (2) that CEE's attorney's fee application was untimely; and (3) that the amount of the fee award was unjustified. We reverse the summary judgment granted to CEE and remand for entry of summary judgment on liability for plaintiff on the cause of action for breach of the employment contract. We take that course because plaintiff was discharged without cause and is thus entitled to the severance pay and benefits called for in that circumstance by the agreement. Although the fee application was technically untimely, the trial judge did not abuse his discretion in considering it on the merits; however, he did err in granting CEE the full amount requested. Therefore, we reverse that order, as well. With respect to these matters, we remand for further proceedings.[1]

I
On August 9, 1996, plaintiff and his associates sold all their stock in Holly Property Management, Inc., to defendant for $1,350,000. Under the stock purchase agreement, if defendant's gross revenues reached certain levels during the following year from its newly acquired customers, the plaintiff and his associates could receive additional consideration ranging from $150,000 to $250,000.
At the same time, plaintiff and defendant also entered into employment and non-competition agreements. Under both agreements, the losing party in any litigation is required to pay the other party's reasonable attorney's fees and costs. The employment agreement gave plaintiff an annual salary of $110,000 plus benefits for two years unless terminated for cause. Section 6 of the agreement defined termination for cause in the following manner:
(a) The Company may terminate the Agreement at any time for Cause (as hereinafter defined) effective immediately upon written notice to Employee. Such notice shall specify that a termination is being made for Cause and shall state the basis therefor. In such event, Employee shall have and shall accrue no additional rights or benefits pursuant to the terms of this Agreement from the date of such termination. For purposes of this Agreement, termination for "Cause" shall be defined as termination because of:
(i) The continued failure by Employee to substantially perform his duties hereunder for a period of fifteen days after the Chief Executive Officer of the Company has made a written demand for performance that specifically identifies the manner in which he believes that Employee has not substantially performed his duties.

*1117 (ii) The commission by Employee of a willful act of dishonesty or misconduct that is injurious to the Company or gross negligence in the performance of his duties.
(iii) A conviction or a plea of guilty or nolo contendere in connection with fraud or any crime that constitutes a felony in the jurisdiction involved.
(iv) The commission by Employee of repeated acts of alcohol or substance abuse that impairs performance or the knowing use of any illegal substances.
A termination for Cause (which shall be in the sole discretion of the Company) must be made, if at all, within ninety days after the Company learns of the latest such event that entitles the Company to terminate Employee's employment hereunder.
(b) The Company may terminate Employee's employment for any reason other than Cause at any time after the first anniversary of the Closing Date. If the Company terminates Employee without Cause at any time, Employee shall be entitled to receive from the Company six months severance and all benefits provided in Section 5 hereof, on the same terms as if his employment had not been terminated but shall not be entitled to receive any other payments, rights or benefits from the Company.
Shortly after plaintiff began working for defendant, under the direct supervision of Nick Schmidt, the president of CEE's Philadelphia Metro Division, he noticed numerous business practices which he believed were harming his opportunity to receive the additional compensation under the stock purchase agreement. On August 1, 1997, his attorney wrote to CEE complaining about various alleged breaches of the stock purchase agreement. Between October 29 and November 17, plaintiff wrote two letters to Schmidt's superiors criticizing a variety of management practices and one letter to Schmidt, with a copy to the superiors, written in a similar vein. The letters were, in part, critical of Schmidt, but they also included many positive suggestions and were neither impertinent nor unbusinesslike. Plaintiff also informed Schmidt's direct superior that Schmidt was attempting to undermine him. Plaintiff was aware that the letters would anger Schmidt, as they did. While being deposed, Schmidt said that plaintiff was "not supportive of my style of management... and ... was unhappy in his current role...." However, there is no evidence that plaintiff ever refused to carry out an order, and defendant offered no evidence of injury "to the Company."
On November 19, Schmidt called plaintiff in for a meeting, also attended by Tim Brink, CEE's Regional Director of Human Resources. We will accept defendant's description of this meeting as set forth in its brief:
Schmidt and Brink testified that Defendant believed it had cause to terminate Plaintiff under his Employment Agreement, but opted, in the spirit of conciliation, to propose without cause termination instead. Defendant offered to characterize the termination as one without cause and to pay Plaintiff six months severance and additional consideration, in exchange for Plaintiff's execution of a Termination Agreement and General Release presented to him at the meeting. Plaintiff refused the offer, declining to even read the proposed Agreement and Release. As a result, he was told to clean out his desk and leave the premises. Because Plaintiff had refused Defendant's proposal, Defendant considered his termination as one for cause under the Employment Agreement.

*1118 II
Defendant claims that it was entitled to terminate plaintiff for cause under paragraph 6(a)ii of the employment agreement because he had committed willful acts "of misconduct ... injurious to the Company...." The acts are said to be the letters plaintiff wrote and his discussion about Schmidt with Schmidt's superior. Good cause for discharge is present, defendant contends, because plaintiff's acts constituted insubordination and harmed the company. Defendant fails, however, to cite any reported case in support of its position other than Alexander v. Kay Finlay Jewelers, Inc., 208 N.J.Super. 503, 506 A.2d 379 (App.Div.), certif. denied, 104 N.J. 466, 517 A.2d 449 (1986), which concerned an "at will" employee who was dismissed after he sued his employer to resolve a salary dispute. Id. at 507, 506 A.2d 379. Since plaintiff was not an "at will" employee, that case is of no assistance in construing the parties' contract in this case.
The trial judge, also without citing any authority, agreed with defendant, concluding as a matter of law that an employee who sends a letter critical of his supervisor to a higher official in the company, without his supervisor's consent, is insubordinate and that the supervisor's hurt feelings establish harm to the company.
We disagree. Our research has revealed no support for the proposition of law offered by defendant and agreed to by the trial judge. Perhaps that is because no well-run company would want to dismiss an employee for merely advising upper management of problems perceived to have been created by a direct supervisor.
Turning to the employment agreement, we begin by noting that it contains no express prohibition of plaintiff's conduct. The defendant's thesis is that "misconduct injurious to the Company" includes insubordination and that plaintiff was insubordinate.
"Insubordination" is not defined in the agreement. Consequently, assuming for purposes of argument that its presence is implicit, we are obliged to accept its ordinary definition since it is not a technical term or word of art and there are no circumstances indicating that a different meaning was intended. Deerhurst Estates v. Meadow Homes, Inc., 64 N.J.Super. 134, 150, 165 A.2d 543 (App.Div.1960), certif. denied, 34 N.J. 66, 167 A.2d 55 (1961).
Black's Law Dictionary (7th Ed.1999) defines insubordination as a "willful disregard of an employer's instructions ..." or an "act of disobedience to proper authority...." Id. at 802. To give one other example, Webster's New International Dictionary (2d Ed.1943) defines insubordinate as "[n]ot submitting to authority; disobedient; mutinous." Id. at 1288. See also, Jeffrey F. Ghent, Annotation, What Constitutes "Insubordination" As Ground for Dismissal of Public School Teacher, 78 A.L.R.3d 83 (1977); Annotation, Employee's Insubordination As Barring Unemployment Compensation, 26 A.L.R.3d 1333 (1969).
In this case, we have neither a willful failure to follow instructions nor an act of disobedience. At most, there was criticism of what the plaintiff believed were his superior's unsound business practices. That is not insubordination.
Generally, a contract provision permitting termination for cause "protects an employee from unreasonable or arbitrary termination." Greenwood v. State Police Training Center, 127 N.J. 500, 509, 606 A.2d 336 (1992). Although precise definition is difficult, id. at 510, 606 A.2d 336, "courts ordinarily uphold findings of good cause when the employee's performance is deficient or when the employee creates a risk of harm to himself or herself or others." Ibid. When those circumstances are not present, as is the case *1119 here, the dismissal is arbitrary. Ibid. (noting that good cause does not exist "if the asserted ground was irrelevant to job performance."). Therefore, under this contract, plaintiff was clearly dismissed without good cause, and he is entitled to summary judgment as a matter of law.

III
Attorney's fees were awarded to CEE under the fee-shifting provisions of the employment contract and the non-competition agreement, and under the LAD. Since we have reversed the summary judgment for CEE on the employment contract and held that plaintiff is entitled to judgment on that claim, the attorney's fee award must, of course, be reversed as well, at least to the extent that it was based on the wrongly granted judgment dismissing that claim.
We turn next to plaintiff's contention that CEE's entire application for fees was untimely. The relevant facts are undisputed. CEE made its application for attorney's fees and costs after the judge had signed the judgment on liability but within twenty days of that event.
In Czura v. Siegel, 296 N.J.Super. 187, 686 A.2d 390 (App.Div.1997), another panel of this court considered the significance of R. 4:42-9(d), which provides that "[a]n allowance of [attorney's] fees made on the determination of a matter shall be included in the judgment or order stating the determination." That panel said "[t]he necessary implication of [that rule] is that an application for the allowance of attorneys' fees ... has to be presented before the entry of the final judgment or, possibly, at the latest, within ten days thereafter by a motion to alter or amend the judgment [under R. 4:49-2]." In 1998, the ten-day period of that rule was changed to twenty days. Pressler, Current N.J. Court Rules, comment on R. 4:49-2 (2001).
We are not in full agreement with Czura. In our view, R. 4:49-2 does not directly govern the issue of an attorney's fee application. It is expressly concerned with "rehearing or reconsideration" of a matter decided by the trial court. See, e.g., Cummings v. Bahr, 295 N.J.Super. 374, 384-85, 685 A.2d 60 (App.Div.1996) (holding the rule applicable only when the court's decision is based on plainly incorrect reasoning or when the court failed to consider evidence, or there is good reason for it to consider new information bearing on an issue decided.). In that regard, we note that the rule specifies that the motion for reconsideration or rehearing include "a statement of the matters or controlling decisions which counsel believes the court has overlooked or as to which it has erred." R. 4:49-2. Since the issue of attorney's fees had not been placed before the judge in this case, there was nothing to rehear or reconsider.
No other rule of court is directly applicable. However, under R. 1:1-2, "[i]n the absence of rule, the court may proceed in any manner compatible with" securing "a just determination, simplicity in procedure, fairness in administration and the elimination of unjustifiable expense and delay." On the other hand, recourse to the relaxation provision should be sparing, especially when reasonable interpretation of other rules can solve the problem. Oliviero v. Porter Hayden Co., 241 N.J.Super. 381, 387, 575 A.2d 50 (App.Div. 1990). Guided by that principle, we agree with Czura to the extent that it interprets the time limitation of R. 4:49-2 as applicable to an application for attorney's fees, subject perhaps to the more expansive provisions of R. 4:50, which might be applicable in some circumstances. Czura's approach reasonably accommodates the interests of both sides without prejudice to either party. We reach that conclusion, in *1120 part, because in this case no application for attorney's fees could have been made until the trial judge determined which party would prevail on each claim. Although the judgment ought not to have been submitted by CEE until it had applied for fees, that technical deviation from Rule 4:42-9(d) does not provide a just basis for denying such fees when the application is made within the time constraints established by Rule 4:49-2. Therefore, we hold that CEE's application was timely.
Plaintiff does not take issue with CEE's right to attorney's fees under either the non-competition agreement or the applicable section of the LAD, N.J.S.A. 10:5-27.1, but he does argue that the judge erred in failing to require CEE to allocate the fees and costs relating to those matters. We agree. When a party is entitled to attorney's fees for only some of the work performed, the relevant services should be identified or a reasonable explanation made for the failure to do so. Shuttleworth v. City of Camden, 258 N.J.Super. 573, 598 n. 17, 610 A.2d 903 (App.Div. 1992), certif. denied, 133 N.J. 429, 627 A.2d 1135 (1993). CEE did neither. However, since on remand plaintiff will be entitled to attorney's fees and costs on the employment contract claim, CEE should be permitted to counter with a proper application for such fees under the non-competition agreement and the LAD.
Affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.
NOTES
[1] Plaintiff's remaining points are without sufficient merit to warrant discussion. R. 2:11-3(e)(1)(E). First, he contends the trial judge committed error in denying his untimely motion for a transfer to the Law Division. R. 4:3-1(b) provides full support for the ruling. Second, he contends the trial judge erred in granting summary judgment to CEE on the alleged breach of the stock purchase agreement. His argument is not that CEE breached a specific provision of the agreement; rather, he contends that it violated the implied covenant of good faith and fair dealing in carrying out its obligations under the agreement. We agree with the trial judge because, as plaintiff conceded during oral argument, and as plainly appears from the record, there was no proof of the essential element of bad faith. See, e.g., Wilson v. Amerada Hess Corp., 168 N.J. 236, 250-52, 773 A.2d 1121 (2001) ("Without bad motive or intention, discretionary decisions that happen to result in economic disadvantage to the other party are of no legal consequence.").